MARION F. EDWARDS, Chief Judge.
| ¡/This is an action for breach of a “Confidential Settlement and Release Agreement” resolving a prior lawsuit between the parties regarding a distribution agreement for Louisiana Football Magazine.[1] Clyde Lee Brecheen, Jr. (“Brecheen”) is the sole owner of Louisiana Sports Enterprises, Inc. d/b/a Louisiana Football Magazine (“LSE”). In this action, Brecheen and LSE assert that defendant, The News Group, L.P. (“TNG”), breached the settlement agreement by failing to make payment to LSE pursuant to the agreement. The petition also asserts that TNG violated portions of the Louisiana Unfair Trade Practices Act in that it operated its business in a manner which offends public | ¡¡policy by substantially impairing competition.[2] In a supplemental and amending petition, Brecheen and LSE alleged further breaches of the agreement including, failure to distribute the magazine in accordance with the terms of the agreement; use of improper accounting and business records; improper supervision of employees; exercising a monopoly over distribution of magazines in the New Orleans area; failing to properly process payments due; and implementing policies and practices in order to punish, or eliminate independent publishers and/or create unfair competition between plaintiffs magazine and national publications.
In the same petition, Brecheen made damage claims for personal injuries, including mental anguish and distress, loss of business values and reputation, and loss of profits. LSE made similar damage claims for loss of business values and abili *1016 ty to sell its magazine, damage to its credit, loss of profits and loss of potential growth.
The court granted a partial motion for summary judgment filed by TNG that dismissed all claims of Brecheen and LSE for damages prior to October 10, 2003, based on res judicata. In a separate ruling, the trial court dismissed the individual claims made by Brecheen. At the close of plaintiffs’ case, the trial court also granted a directed verdict dismissing all claims for bad faith breach of the Confidential Settlement Agreement, and all claims made by both parties under the Louisiana Unfair Trade Practices Act.
The remaining claims of LSE went to trial. At the end of the five-day jury trial, the jury answered interrogatories finding that TNG breached the Confidential Settlement and Release Agreement by unreasonably delaying payment to LSE for the magazines delivered. Further answers show that the jury found that the Lpayments should have been made by August 7, 2004, and that LSE suffered $194,000 in damages for loss of profits caused by other breaches of the Settlement Agreement.
On June 4, 2010, the trial court rendered a final judgment confirming the jury’s findings of damages in the amount of $194,000 in loss of past profits, plus legal interest thereon from date of judicial demand, and for legal interest calculated on the amount of $7,636.23, the amount owed LSE pursuant to the distribution agreement from August 7, 2004, until paid. In that same final judgment, the trial court also reduced earlier rulings referred to hereinabove to judgment. It dismissed the individual claims of Brecheen with prejudice, and it granted the motion for directed verdict made by TNG on all the claims by LSE under the Louisiana Unfair Trade Practices and Consumer Protection Law and for bad faith breach of the Confidential Settlement Agreement with prejudice. The judgment also denied a motion for directed verdict made by TNG at the close of trial seeking dismissal of all other claims.
LSE filed a Motion to Tax Costs and Set Attorneys’ Fees. TNG filed a Motion for Judgment Notwithstanding the Verdict, New Trial or Remittitur. The trial court rendered a second judgment on March 14, 2011, denying the Motion for Judgment Notwithstanding the Verdict, for New Trial or Remittitur, and ordered TNG to pay LSE court costs, expert witness fees, and litigation expenses in the amount of $38,295.73. According to the judgment, that amount included a fee of $3,500 for LSE’s expert witness. The judgment also ordered Brecheen to pay TNG $4,590, an amount representing the cost incurred in connection with the dismissed personal injury claims of Brecheen, but it denied any further claim for attorneys’ fees brought by TNG. Further, the judgment awarded LSE attorneys’ |5fees in the amount of forty percent of the principal and interest accrued under the jury verdict.
Both LSE and TNG have appealed both judgments to this Court. TNG has assigned five errors for our review relating to the issues of breach of the Settlement Agreement, damages, jury instructions, award of attorneys’ fees, and the accrual of interest. LSE assigns two errors concerning the award of attorneys’ fees and costs.

FACTS

Brecheen testified at trial about his lifelong dream to start a magazine about high school and college football in Louisiana. He told the jury the path he took to ultimately achieve this dream in 1997, and explained the difficulties of distribution and selling advertising in a startup magazine publication. Brecheen personally distributed the magazine to newsstands, local *1017 Barnes and Noble Stores, and local Cracker Barrels. Shortly afterward, Brecheen contracted with ETD Kromar, which later merged with TNG, for extended distribution of the magazine.
In the beginning all went well, and the magazine was distributed around the state and sold well, bringing in more revenue from advertising. However, problems developed with TNG in 2001 causing LSE to lose outlets for the magazine, advertising, and revenue. In 2002, LSE filed a lawsuit against TNG that was settled by the parties in 2008. As part of that settlement, a new distribution agreement was reached.
The Confidential Settlement and Release Agreement was effective October 3, 2003. Parties to the agreement were Bre-cheen and LSE, collectively LSE; TNG; and Ruben Lopez. The agreement was made pursuant to the lawsuit styled Clyde (Lee) Brecheen and Louisiana Sports Enterprises, Inc., d/b/a Louisiana Football Magazine v. The New Group, L.P. and Ruben Lopez, No. 56,910, in Division “D”, Twenty-Ninth-Judicial District Court for the Parish of St. Charles. The document | Rstates that “the intent of the parties is to settle and compromise the claims asserted in the action, as well as any and all other actions that were or could have been alleged.” The relevant sections of that document are as follows:
Distribution Agreement between LSE and TNG:
4.1 Settlement Payment
Solely in the interest of avoiding the uncertainty of litigation and the cost of defense, TNG hereby agrees to pay twenty-five thousand five hundred and no/100 dollars ($25,500.00) to Brecheen, and his counsel of record simultaneous with the execution of this Agreement.
4.2 Distribution Agreement
The new distribution agreement between TNG and Brecheen will be as follows:
a. TNG will distribute 1500 of Bre-cheen’s magazines per issue.
b. This distribution arrangement will continue for a period of five (5) years from Effective Date of this Agreement.
c. Payment will be made on 90 day term, but Brecheen must send monthly statements to Accounts Payable, P.O. Box 2768, Corpus Christi, Texas 78403 with the date of the postmark on his mailing commencing the 90-day term. Payment will be made based upon the end of the month balance, less two (2) months deferred billing, less returns in transit, less shortages and less outstanding checks, which is the normal payment arrangement.
d. TNG will permit Brecheen to select the stores where the magazines will be distributed from a list of retail outlets that carry his titles on their authorized list, with the following caveats: (1) the stores in question must approve of Brecheen’s titles being sold therein prior to either Brecheen’s selection of the stores or the delivery of magazines to the stores; (2) to the extent that Bre-cheen desires to have his magazines distributed from a store or stores that currently does not list said magazines on the stores’ “approved titles” lists, it will be Brecheen’s responsibility, and not that of TNG, to contact and negotiate with those stores in order to get Brecheen’s titles listed on the “approved titles” lists; and (3) TNG will not be obligated to distribute Brecheen’s magazines at any locations where the *1018 titles are not on the “approved titles” list.
e. Shelf life of each issue will be four (4) weeks.
f. As of October 2003 TNG’s New Orleans distribution center is being consolidated into the TNG distribution center in San Antonio, Texas. TNG will agree not to assess Bre-cheen with any handling charges 17provided that Brecheen both arranges for and pays all costs of freight shipment of his magazines to TNG’s San Antonio distribution center....
g. TNG will distribute five (5) magazines to each store provided that five (5) is the minimum and this term is not intended to nor will be construed to sidestep any limitations on distribution imposed by either the store locations (i.e. the “approved titles” lists or the number of magazines the store in question will accept) or on Brecheen’s obligations to get his magazines listed on these lists.
h. All returned magazines will be destroyed, and TNG will have affidavit privileges for said destruction.
i. TNG will pay Brecheen sixty percent (60%) of the cover price of his magazine titles for the distribution of same.
j. Aside from those costs included herein and particularly excluding the cost of crate shipment of product to San Antonio, there will not be any other cost associated with this arrangement.
Section 4.3 of that agreement released defendants from all claims in contract, tort, etc. arising out of the action that led to this Settlement Agreement.
After the settlement was reached in 2003, Brecheen and his staff were excited about the distribution of the magazine and the return of advertising revenues. The company made expansion plans to go into surrounding states using the same magazine model and purchased the necessary licenses. However, new problems developed with the distribution. LSE never got distribution back in the “A” stores in which the magazines were stocked before the original contract with TNG. Consequently, LSE got neither the pre-contract advertising revenue it enjoyed, nor the increased sales it expected.
According to Brecheen’s testimony, LSE sent 1500 copies of seven issues of the magazine in the next two to three years to TNG for distribution. LSE stopped sending copies of the magazine to TNG in 2007 because LSE received no payment from TNG for those seven issues.
Delores Thompson (“Mrs. Thompson”), Brecheen’s mother, testified that Brecheen wanted to start his own magazine and took out a small business loan to begin. He did most of the work himself, including publication and distribution. | sMrs. Thompson ultimately became involved in the business, doing office work, bookkeeping, and anything that was needed. Brecheen contracted for distribution. In the beginning of the contract, Randy Hoffman (“Hoffman”) was the head of distribution of TNG in Rayne, Louisiana. In February of 2000, Mrs. Thompson faxed Hoffman requesting a spread sheet of the retail outlets where the magazine was sold because of “a flood of calls” as to where to buy the publication. The magazine was doing well. However, after the merger, the account was handled from a Texas office, and the relationship between LSE and TNG began to deteriorate, precipitating the original lawsuit between the parties in 2001.
Mrs. Thomson testified as to the relationship between LSE and TNG after the *1019 2003 Settlement Agreement. As per the portion of the agreement that stated that TNG will permit Brecheen to select the stores where the magazines will be distributed from a list of retail outlets that carry his titles on their authorized list, Mrs. Thompson testified that, although she called them several times about it, TNG did not send this list until six months later after her attorney became involved. Mrs. Thompson picked certain retailers from the list and sent them to TNG. It was important that Brecheen select the stores because of previous success at those locations. Mrs. Thompson contacted the retailers in an effort to get the magazine on the shelves in these outlets, but she was told she had to get approval from TNG to get in the various stores. Mrs. Thompson was excited about having the magazine in the Market Basket stores, and “Mr. Keith,” who owns the Market Basket stores, told her to send a request to Dave Forsman (“Forsman”) of TNG’s marketing division. Forsman did not return her several calls.
After sending the first issue to TNG for distribution, Mrs. Thompson heard nothing back, even after sending an invoice and statement. The first one was sent in April of 2004, and TNG had put some magazines in places that “surely” were |flnot going to sell them and which were not authorized by Brecheen. When she did not hear from Forsman, Mrs. Thompson contacted Joy Neimeier (“Neimeier”) of TNG in May 2004, and she asked if Neimeier would contact the manager about it. Neimeier told her it was against company policy to discuss anything with her. When Mrs. Thompson explained that they needed to be on the same page to work, Neimeier replied, “It’s not our problem.” Market Basket was never approved as a distributor by TNG.
In May of 2004, Mrs. Thompson sent TNG a list of retail stores to which the magazine was already independently distributed. TNG never replied to her inquiries of the stores where they distributed the magazine, so Mrs. Thompson hired counsel. She continued to send credit memos, statements, and invoices but was never paid. The lack of funds caused difficulty for LSE because the cost of production continued, requiring a fifty percent down payment with the remaining fifty percent due within thirty days of publication. Several more magazines were published by May of 2005, for which TNG never made payment. Mrs. Thompson confirmed that she was sending the invoices to the proper address. Despite not hearing from TNG, she continued to send them the magazines for distribution.
Mrs. Thompson testified as to the number of issues printed both before and after the agreement. The number significantly decreased between 2002 and 2007. Mrs. Thompson did not remember if she notified TNG that LSE was using other distributors as well as TNG. However, she was sending TNG 1500 copies of each one as per the agreement, and TNG was aware that about 13,000 copies were generally being printed at that time. Other distributors were placing the magazines in outlets where TNG did not. Mrs. Thompson acknowledged a list of outlets where the magazine was being placed by other distributors.
110Carl Thompson (“Mr. Thompson”), Brecheen’s stepfather, testified that, when the magazine was first published, Bre-cheen did most of the work himself, including distribution. In 1999, Mr. Thompson began to help delivering the magazines to convenience stores. Mr. Thompson met Hoffman, who worked with TNG at the Rayne location. There were questions as to whether some issues *1020 were being properly distributed in the New Orleans area by TNG, through the St. Rose center, but in Rayne, sales were going well. Mr. Thompson tried to arrange meetings with TNG to discuss the situation, but he was turned away. In June 2001, Mr. Thompson wrote to TNG terminating the business relationship. Ultimately, Mr. Thompson quit working with the magazine because Hoffman had taken over distribution.
At the time of trial, only one issue of the magazine was being produced annually, whereas in 2001, five or six issues were being published. This was due to lack of distribution by TNG.
Neimeier’s deposition was read into the record.[3] In that deposition, Neimeier testified that she was employed as a distribution manager for TNG in San Antonio, Texas. She first handled the LSE account in April of 2004. Neimeier explained that LSE’s account was formerly handled by an office in St. Rose, Louisiana. However, St. Rose was not part of the merger so LSE’s account went to the San Antonio office. Although this event happened after the Settlement Agreement was reached, Neim-eier testified that she was not aware of the first lawsuit. Mrs. Thompson sent a list of the chain stores to which she wanted the magazine distributed for sale. Neimeier denied ever speaking to Mrs. Thompson, and stated that the only communication between the two women was by written correspondence. Neimeier had the final authority to decide which chains the Inmagazine would go to for distribution. She explained that the magazine had to be on the approved list of the chain stores. Neimeier checked Mrs. Thompson’s list against TNG’s master list of which magazines were approved for the chain stores and only distributed the magazines to the stores that had approved Louisiana Football Magazine. Marketing is not part of her job description, so Neimeier did not contact any of the chains on Mrs. Thompson’s list to see if TNG could get approval for distribution in those stores. Neimeier also testified that she did not contact anyone in TNG’s marketing department to make them aware of Mrs. Thompson’s requests.
Neimeier stated that, when a publisher requests distribution in a certain store, she sometimes makes an effort to get that publication on the approved list. She did not make that effort with Louisiana Football Magazine, because it was a small, local publication. She did distribute the magazines in Louisiana stores to meet the 1500 magazines distribution quota. Neim-eier testified that she only sent out a report on the stores to which a particular magazine was distributed upon request. However, she keeps no records of who makes such a request, or if she complied with that request. Neimeier did have a distribution report on Louisiana Football Magazine generated in May of 2004 for the first publication distributed, although she had no records on who requested it or if it was sent out to anyone. Further, she has no other distribution reports because they have been “aged out,” meaning they have taken off of the computer.
Neimeier testified that she distributed the magazine to six of the stores requested by Mrs. Thompson, and then she made the determination as to where the remainder of the magazines would be placed. She did not make a complete list of all the places the magazine could be placed to give the publisher the choice of where to distribute the remaining magazines because of time constraints. | ^However, Neimeier could not recall how much time *1021 passed, between the receipt of the notice and the receipt of the publication.
Neimeier testified that it was her assumption that the distributed magazines were placed on the main line magazine rack in the stores because that is the duty of the merchandisers and drivers of the distribution department of TNG, of which Bob Territo is the director. However, she admitted she never went out to the field to check on Louisiana Football Magazine because it was only distributed in Louisiana and she lives and works in Texas. Neimeier also stated that she had never actually seen the publication, and she had never spoken to anyone from LSE. The only criteria she used for distribution was authorizations from stores. When asked how a publisher would be able to check to see if the magazine was properly distributed and displayed without a list of which stores the magazines were in, Neimeier responded that she did not know.
Neimeier knew nothing about how the magazine had been distributed in St. Rose before the Settlement Agreement. But, she did state that, even if the magazine had been distributed to Walgreens stores in the past, it is TNG’s policy not to distribute magazines to stores that have not officially authorized the distribution of a particular magazine. Neimeier further stated that she would not have done anything further than check the authorization list for Walgreens even if she knew the publisher requested distribution there. Neimeier stated that, although Louisiana Sports Magazine sold poorly, she never notified the marketing division of TNG. Neimeier indicated that, if Mrs. Thompson wanted Louisiana Football Magazine on any of the authorized list of requested stores, she would have to go through marketing, a department headed by Forsman.
Neimeier explained the process of distribution and the formula used for delivery. She admitted that, given the base dictated by this formula and the | ^adjustments made by the computer after consideration of sales and the 1500 copies that must be distributed by contract, there were more than five copies distributed to each store. Neimeier admitted that she did not adjust the stores or the number of copies distributed after this occurred, and she never informed the publisher that she was putting more than five copies in some stores. Neimeier also admitted that she arbitrarily decided to consider whether an increase or decrease in allotment was necessary after the sixth issue of Louisiana Football Magazine, even though she knew nothing about the magazine or the publisher.
Neimeier stated she did not have any records of distribution other than the April 2004 report and could not retrieve any further information from her computer. She explained that she re-organizes the files every month and does not save prior information. She was made aware of the lawsuit in February of 2008. She explained that magazines often ceased publication, so she did not notice when she was no longer receiving Louisiana Football Magazine for distribution.
The deposition of Bob Territo (“Terri-to”) was read to the jury. In it, Territo stated that he is the Director of Distribution Centers for News Group Central. He had been the general manager of the San Antonio division. After the first lawsuit, Gary Korn (“Korn”) told him the number of copies that were to be distributed as per the agreement. Territo told Neimeier they would be distributing the magazine and that they had to work with the publisher to follow the guidelines set forth in the settlement and distribute 1500 copies. He relied on the distribution department to handle the matter.
In this case, TNG has 1500 copies to distribute, and the number of copies for *1022 each store is keyed into a computer. The system allows for 200 percent of that figure to go out. The system is set to hold five issues for each monthly magazine. The number the retailer actually sells determines the number he will receive for the l14next issue. TNG will accept the stores chosen by the publisher; most publishers know the system and will get as close to the allotment as possible. Territo explained that the computer’s formula determines how many issues go in which outlets and will adjust up or down depending on sales. Territo was not involved in payables.
TNG does not determine where the magazines are displayed; rather, the retailers do that. The stores would also determine how long the magazine would stay on the shelf. In the Settlement Agreement, it was stated the shelf life would be four weeks. Neimeier would not necessarily have been aware of this, as she did not have a copy of the agreement. However, the twenty-eight-day requirement would have been keyed into the system. Territo based his answer on the affidavit returns. He had no explanation for the drop in sales once the company moved to San Antonio.
Korn keeps the retailers’ payment records for TNG. TNG is paid according to the invoices rather than on a title-by-title basis. The publishers do not know what is going on with their magazines unless they request reports showing where TNG has placed it. Further, the returns records from merchants do not specify if any of the titles returned were for Louisiana Football Magazine because it goes not by title but by document number. TNG does not lose money on a return because the publisher gives it credit; however, it does not make money if the magazines are returned.
Arthur Carter (“Carter”) worked for Louisiana Publishing as a distributor between 1998 and 2008 and testified as an expert in the field of periodical distribution. Louisiana Publishing consists of several magazines, including the publication Louisiana Sportsman. Carter also distributed Louisiana Football mostly to “C,” or convenience stores. He explained that “A” stores are large 11fichains such as Wal-Mart, and TNG handled Louisiana Sportsman in those stores. The “A” stores require more time than the “C” stores. He was certain that TNG was aware he was distributing LSE’s magazine in some markets, including Cracker Barrel. He disagreed with the idea that there was no market for the magazine, citing figures to show that sales were increasing in 2005. The magazine had a specific niche in the market. Carter believed the publication would sell anywhere, conditioned on proper display.
The preview issue was by far the best selling issue of Louisiana Football Magazine. Carter opined that it would be unfair to compare sales of the preview to the other issues the magazine published unless you were going on a year-to-year basis.
Korn testified that he is the Vice-President Comptroller of Periodical Services, the parent company of Lone Star Periodicals d/b/a TNG. He was the “point man” for the initial settlement agreement and was working closely with Territo, the general manager since 2005. Territo was the key contributor to the distribution activities portion of the contract; Korn’s input was the cash/payment responsibility. Forsman’s job is as intermediary between TNG and the retailers. In general, Korn’s responsibilities include accounting, payroll, accounts payable, publisher payables, accounts receivables, human resources, external audits, and coordination of financing.
*1023 Korn explained the distribution process, wherein the magazines come from the publisher to the distribution center. The magazines are then moved to racks, and Neim-eier receives the “key copy.” Then, the publications are moved to a conveyor system where they are bundled according to the outlets to which they will be sent. The bundles, or “totes,” are placed on palettes and sent to satellite 11fioffices, delivered to trucks, and then to retailers. Returns are picked up, verified, and inventoried to determine credits due.
TNG begins payment processing when it receives a statement from the publisher. Korn testified that TNG did not receive any statements from LSE until May or June of 2005, and the statements went to Nicole Smith (“Smith”) of accounts payable. If Smith received a statement, that would initiate the payment process. None of the statements were received until after TNG was served with the lawsuit. There was a stipulation made by TNG’s attorney that, in May 2005, Korn received from his lawyers a packet of monthly statements. However, Korn testified that he did not receive that mailing, although he later stated that he thought his attorney showed him the documents. Korn believed the statements were difficult to reconcile and did not consider them to be monthly statements for the full period of time up to that point.
Monthly statements contain invoices with credit memos, balances, payments applied, etc., and state that payment is made on end-of-the-month balance, less two months deferred billing. Korn reviewed statements and invoices that were received in May, June, and July 2005. TNG received no statements and no phone calls from anyone from LSE prior to the filing of the present suit. He was shocked as there was no “normal” collection process. Because of Hurricane Katrina, TNG lost contact with its attorneys, and Korn was not sure what to do or when he gave Smith the information. All the statements sent by LSE had problems. Ultimately, the reconciliation done by Smith reflected seven issues, showing over $7,000 owed, which Korn stated was overpaid. The statements received in June of 2005 were not paid until March 2006; none of the documents sent by TNG’s counsel in May 2005 were in Smith’s file. According to Korn, Smith had only the June 30, 2005 statement with which to work.
117Regarding the list of approved stores, it is the publisher’s responsibility to seek out approval from the stores requested. Korn did not inform Forsman about the Settlement Agreement. He did not give any memos to Smith, because the way the agreement is written is exactly the way TNG pays all its publishers.
Exhibit P-28 consists of e-mails. One from Korn, dated April 15, 2004, explains to LSE’s attorney where the magazines were to be shipped (San Antonio) and where the statements were to be sent (Corpus Christi). In July, TNG left Corpus Christi and moved to San Antonio.
Korn also testified that LSE stopped shipping magazines before the end of the five-year agreement.
Robert Woosley (“Woosley”), an expert in the field of business analysis and evaluation, reviewed LSE’s financial records from 1997 through 2006. Woosley did a two-year investigation and evaluation of LSE. In the course of that investigation, Woosley interviewed Brecheen and read the depositions of many of the -witnesses for both parties, and that of a publishing consultant. Woosley also reviewed sales and advertising data from TNG, and other correspondence. Woosley stated that he was in court and heard the testimony of parties and witnesses who came before him.
*1024 Woosley explained that he had been hired by LSE’s counsel to set a value of direct and secondary costs of losing the contract between LSE and TNG for the purpose of evaluation from the date of the settlement in 2003 through 2006. Woosley explained the evaluation process of a small business starts with the acquisition of all the background information on the type of company, the knowledge and ability of the owner, capitalization of the company, the usefulness of the product, the trends in the particular business field, and the potential for growth.
| irLSE has a few people of concentrated skills, so that would heighten the risk taken on by a purchaser of the business and lower the value of the company. Mr. Woosley then considers the actual success of the business over the period in question, considering all of the relevant factors. He assigns a number to that risk value and uses it in an equation into which income and taxes are factored to arrive at an evaluation.
Woosley testified that LSE showed marked growth from the beginning that peaked in 2001 and then “dramatically dropped off’ in the following years. Mr. Woosley further stated that it was clear that something happened in 2002 and 2003 to change the course of the growth. A downturn that dramatic would not normally happen until the product reached it saturation point or a new competitor came in. Neither event occurred in the case of LSE. The loss of cash flow also adversely affected the business. A reduction in cash flow reduces the quantity of the product.
Woosley also considered the advertising revenue history for LSE. In 2001, the company was doing well, with the high watermark at $181,000. Right after the settlement in 2003, the revenues spiked again, but declined shortly after.
Woosley estimated the value of LSE to be between $300,000 and $500,000 just after October 2003. The current value is near zero. Woosley stated that the contract was for five years, six issues a year. LSE received $3.50 per issue. If the sales were 100 percent, each issue would have contributed $5,355 total. Thus, the total value of the contract was $160,650. However, Woosley stated that 100 percent sales was unrealistic.
Woosley compared the high advertising sales figure to 2004 and found a loss of $54,000. Total lost sales from 2004 to 2008 were $478,000. Woosley explained that LSE was able to reach $181,000 in 2001 on its own. If it were able to get back in the stores it had then, and sell the magazine, it could have grown the 119sales to that higher figure. Woosley further opined that, if LSE had been able to expand into other states using the Louisiana model, the potential value would be closer to 1.5 million dollars. However, at the time of trial, the value of the company was zero. That is because a company’s value is a future number. A potential buyer is interested in what the magazine will bring in the future, not what it’s done in the past.
LSE also presented testimony, one by deposition and one by stipulation, that coaches in the area were aware of and very interested in the magazine.
After Woosley’s testimony, LSE rested. TNG moved for directed verdicts on the claims brought by LSE[4] under the Unfair Trade Practices Act and bad faith breach of contract. Both motions were granted by the trial court.
*1025 Forsman, who is currently the Executive Vice-President of Sales and Marketing at TNG, testified at trial. Forsman explained that the wholesaler, TNG, is paid a percentage of the cover price for magazines sold. Any unsold magazines are returned and credited to the retailer. A national distributor is a middleman between the publisher and the wholesaler and acts as a clearinghouse for money transactions between the two, almost like a bank. They bill for the product and, in return, collect payment for the product shipped to TNG. Louisiana Football Magazine did not have a national publisher, it was a small, independent publisher.
In the course of his employment, Fors-man works out agreements with retail buyers. In most cases a retailer requires the magazine be on an approved list, because they maintain a strict authorized list of publications they are willing to sell in their stores. When a publisher has a wholesaler, it is the publisher’s responsibility to obtain approval for the retailer. To get on an approved list for a national chain, they must contact the headquarters for approval. TNG does not 1 ^control placement. For larger “A” stores, TNG would go through the back of the building to get checked in, have the magazines scanned, and then proceed to the sales floor to merchandise. Between 2000 and 2004, general magazine space, as well as display space in “A” stores, has decreased. Sales softened during that period. Forsman testified that, if the company overrode an approved list in a store with scan-based trading, the publisher would not get paid for that magazine. About 60 percent of TNG’s total volume is now scan-based and, in the “A” stores, 80-90 percent is scan-based trading. In scan-based stores, if a wholesaler tried to override the authorized list, it would negatively affect TNG’s relationship with that company. Magazines could not be authorized over the phone in these stores.
Forsman stated that he never received any messages from Mrs. Thompson, nor did he receive the letter she sent. He interacts with “Mr. Keith” from Market Basket periodically. Forsman testified that “Mr. Keith” told him he did not recall any conversations with Mrs. Thompson. He then stated that he was not aware that Mrs. Thompson was trying to place Louisiana Football Magazine in Market Basket. If Mrs. Thompson could have gotten in contact with him, he could have contacted “Mr. Keith” about distributing the magazine. He could have helped her get the magazine distributed to some other retailers.
In his experience, sports magazines sell better in “C” stores. TNG delivers to about 7500 retail stores. He had not known who Mrs. Thompson was until 2008. Forsman stated that, because TNG is always looking for new titles, her call in 2004 would have been a priority.
Forsman testified that he was never aware of the Settlement Agreement and did not know that LSE was a client until his deposition was taken. He saw the list of retailers that Mrs. Thompson was requesting as outlets; some were stores that other distributors handled, but Neimeier would know that. (Later, Forsman | ¾1 testified that Neimeier may not have known which retailers were supplied by which distributors.) She would be more focused on the stores to which they deliver, rather than the ones to which they did not. She would have focused on setting up distribution first with the retailers TNG currently supplied, and she would pay no attention to ones they did not already service as they would not be on the computer system. Once Delores got approval, she would have to work with Neimeier in distribution. The distribution department *1026 can then make sure the magazine is distributed those markets.
Joseph Luca (“Luca”), a newsstand consultant, was qualified as an expert in magazine marketing. He testified that the retailer gets paid when a magazine is sold, and the wholesaler gets paid a percentage of the cover price. A national distributor typically handles the billing issues with the wholesaler, and about 96-97 percent of magazines have national distributors. National distributors help publishers obtain approval by retailers. Luca thought the industry standard was that either the national distributor or the publisher’s consultant would obtain approval by retailers as opposed to the wholesaler obtaining such approval. With “A” stores you have to go to the national headquarters. The wholesaler does not control the magazine placement; rather, it follows the plan of the national chain. Magazine space has been on the decline and titles and checkout space has also decreased. It costs publishers more to have their magazines at the checkouts. The retailer will charge an extra 10 percent on every magazine if it is at the display counter. Preview magazines sell better than “recaps.”
Luca knows Forsman as well as Smith and finds them prompt in returning phone calls. He found all the employees at TNG, including Neimeier, to be very responsive. Luca has represented magazines distributed by TNG and only had problems when the clients failed to send invoices. His clients, who have | ^independently distributed titles, are very happy with TNG. Luca would never recommend a publisher deal directly with the wholesaler.
Luca explained that the process of distribution is unknown to publishers. If they hired a consultant, it would free their time to get advertising.
Neimeier was called to the stand. She testified that she has been employed with TNG since 1999 and is currently the distribution manager. She explained that she had a medical procedure that required fasting the night before the deposition, read earlier to the jury, was taken. Neim-eier testified that she received a letter from Mrs. Thompson in April 2004, requesting chains and retailers to which she wanted the magazine distributed. Some of the retail outlets on the list had authorized the magazine but most had not.
For the most part, her testimony was aligned with the testimony in her deposition, although in greater detail. She explained the necessity for authorization to place a magazine in a retail outlet, and the computerized system used by the company. She stated that the system could be set to issue a “hold code” to keep more than five magazines from going out to one store. The system can also automatically regulate orders to change distribution to add additional copies in the distribution when the allotted copies are sold. However, her testimony was general, and it is not clear what specific codes were entered for LSE.
Neimeier also testified that LSE’s magazine had a shelf life of twenty-eight days, and any copies of the magazine returned to TNG from the retail outlets would be credited and would affect payment to the publisher.
Neimeier stated that she never spoke to Mrs. Thompson and was not informed that LSE stopped shipping magazines. She never tried to call Mrs. Thompson, but she did correspond with LSE’s counsel, Owen St. Amant, although Neimeier testified that she did not know that Mr. St. Amant was an attorney. | MWhen asked who she thought he was, and why she did not just call Mrs. Thompson, she answered, “I don’t know.”
*1027 Smith testified that she was the publisher payables clerk with TNG in 2001, and is now payroll manager. Korn is her immediate boss. Before paying a statement, it had to be reconciled. Included in the reconciliation are bulk returns, and the most important part of that is the credit memo number. Bulk returns indicate magazines not sold, for which TNG does not pay. Most publishers identify this number in their statements; if not, Smith must use the date and/or dollar amount. Smith had to go through every bulk return and figure out which one tied to each statement; there were at least fifty bulk returns to reconcile. The statements sent by LSE were shown on slides, and they did not contain the credit memo numbers, although they did have the dates. The inconsistencies received from LSE made reconciliation very difficult, and she had never encountered it before. One credit of $128.52 for issue 88 was never issued. After payment is issued, sometimes TNG receives returns, as happened in this case. Once all the returns were in, LSE still owed TNG $117.81.
On cross-examination, Smith testified that she had never before seen some of the statements, invoices, and credit memos that were part of the packet sent to the company by TNG’s attorneys in May 2005. These were some of the things Smith would have needed from the publishers, but about which she testified were never received prior to that. The statemehts were finally reconciled in February of 2006. Smith did not know why it took so long to pay.
Smith did not recall ever receiving a phone message from LSE about unpaid invoices.
Harold Asher (“Asher”) was qualified as an expert forensic Certified Public Accountant. He examined Woosley’s report, but his focus was on the LSE’s tax | ^returns as the best indicator of profitability. He disagreed with three aspects of Woosley’s report: LSE’s actual income; saved expenses relating to the cost of printing; and lost income in advertising attributed to TNG. Asher looked at the net income. He explained that, for purposes of presentation, all expenses should be included, but Woosley “cherry picked” which expenses he would allow. Woosley failed to deduct saved publishing expenses.
Had the contract been completed and thirty issues printed and distributed, rather than just the seven that were distributed, LSE would have suffered a loss on the remaining projected twenty-three issues. Asher also disagreed with Woosley because he only calculated lost revenues from not publishing the new issues, and did not calculate the saved expenses.

LAW AND ANALYSIS

As previously noted, both TNG and LSE have filed appeals in this matter. TNG assigns five errors for our review as follows:
1.) The jury erred in finding, and the trial court erred in denying, the defendant’s Motion for JNOV or New Trial on the issue of, breach of the Settlement Agreement.
2.) The jury erred in finding, and the trial court erred in denying the defendant’s Motion for JNOV, or New Trial or Remittitur on the issue of, damages arising from the alleged misdistribution of the magazines.
3.) The trial court erred in refusing to instruct the jury on comparative fault.
4.) The trial court erred in setting interest to run from dates before obligations accrued or alleged losses were incurred.
*1028 5.) The trial court erred in denying defendant attorneys’ fees for the portions of its successful defense.
In the first assignment of error, TNG asserts that the trial court erred in denying its Judgment Notwithstanding the Verdict (JNOV) or New Trial on the issue of the jury’s finding that TNG breached the Settlement Agreement.
|gfiA motion for JNOV may be granted on the issue of liability or on the issue of damages or on both issues.[5] The strict criteria for granting a JNOV is predicated on the rule that when there is a jury, the jury is the trier of fact.[6] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.[7]
TNG’s argument in support of this first assignment of error relates to the finding that it breached the Settlement Agreement by failing to distribute the magazine as provided for in the agreement.
Contracts have the effect of law for the parties and must be performed in good faith.[8] Interpretation of a contract is the determination of the common intent of the parties.[9] Where factual findings are pertinent to the interpretation of a contract, those factual findings are subject to the manifest error standard of review. Absent a finding of manifest error, the judgment should be upheld.[10] An obligor isj^liable for the damages caused by his failure to perform a conventional obligation. “A failure to perform results from nonperformance, defective performance, or delay in performance.”[11]
In the matter before us, the contractual agreement is clear and needs no interpretation. The relevant clauses in the Settlement Agreement state that TNG must distribute 1,500 magazines per issue in outlets where the magazine was approved, with a minimum of five copies in each location.
TNG makes no argument that it complied with the above-agreement; rather, it argues that Brecheen and LSE are responsible for TNG’s failure to meet its obligations under the Settlement Agree *1029 ment. Specifically, TNG argues that Bre-cheen and LSE did not meet their obligations under the Settlement Agreement to provide TNG with their selection of stores for the distribution; and, further, failed to contact and negotiate with those stores in order to get the titles on the approved-titles list. TNG argues that LSE imposed its obligation to get the titles on the approval lists of stores to TNG; thereby putting TNG in a position in which it could not perform its obligation under the contract to distribute under the Settlement Agreement.
We do not find TNG’s argument persuasive. Because these contractual obligations were part of a settlement of a prior lawsuit between the parties, the parties corresponded via their attorneys. In March of 2004, counsel for TNG sent a copy of the list of retailers that had already included LSE’s titles. On April 6, 2004, LSE’s counsel forwarded LSE’s selections for distribution, and it asked for a representative from TNG to correspond with Mrs. Thompson and for an address for sending invoices. Counsel for TNG sent the requested information to LSE’s attorney, naming Neimeier as the contact li>7for distribution and Smith as the contact for the publisher/payable inquiries. TNG’s counsel also noted that some of the stores selected by Mrs. Thompson, including Walgreens and Target, did not have LSE’s magazines on the approved-titles list. However, TNG’S counsel informed LSE’s counsel that TNG would “still be able to distribute the full 1500 magazines to the remaining locations per the terms of the Settlement.”
Neimeier testified that she knew nothing about the Settlement Agreement and arranged for distribution of the magazine according to her list of stores where the title was approved.
We find that this testimony in and of itself shows that the Settlement Agreement was breached by TNG. The person responsible for distribution under the terms of the agreement knew nothing of the agreement. Thus, it clearly shows that the Settlement Agreement was not utilized in the distribution. Accordingly, we find no merit in this assignment of error.
In the second assignment, TNG argues the trial court should have granted the Motion for JNOV, or New Trial or Remittitur on the issue of damages arising from the alleged misdistribution of the magazines. Specifically, TNG argues that the award cannot be reconciled with the evidence and the instructions the jury was given to follow, especially in the calculation of loss of sales revenue and loss of advertising.
Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived.[12] An obli-gor in good faith is liable only for the damages that were foreseeable at the time the contract was made.[13] As a general rule damages for loss of profits may not be based on speculation and conjecture; Lshowever, such damages need be proven only within reasonable certainty.[14] Broad latitude is given in proving lost profits because this element of damages is often *1030 difficult to prove and mathematical certainty or precision is not required.[15] An appellate court will not disturb such damage awards in the absence of a manifest abuse of discretion.[16]
Lost profits are calculated by deducting the expenses that would have been incurred if the parties had complied with the contract from the gross revenues that would have been derived from the contract.[17] The jurisprudence is clear that fixed costs are not to be deducted from gross revenues in determining an award for lost profits.[18] Fixed costs are defined as those “[c]osts that do not vary with changes in output,” such as management expenses, taxes and depreciation expenses.[19] Finally, while the lost profit award may not be based upon speculation and conjecture, “the absence of independent, corroborating evidence may not be fatal to the plaintiffs burden of proof.”[20]
Both parties offered expert testimony in regard to damages sustained by LSE as a result of the breach of the Settlement Agreement. Robert Woosley (“Woosley”) testified for LSE, that the total loss of sales between 2004 and 2008 was $478,000. Ultimately, Woosley opined that if Bre-cheen were able to get back into the stores he had in 2001, at which time his sales figures were $181,000, he could have grown sales to that higher figure. Woos-ley also estimated that the |2flvalue of the company plunged from about $800,000 to $500,000 to a theoretical value of zero during that period.
In response, TNG argues that the loss of past profit award does not take into consideration the expenses of the magazine production. Further, TNG argues that much of the loss of profits relates to the fact that TNG published fewer issues during the relevant time period. TNG also cites down trends in the magazine market and the general economy as a factor to be considered in the damage award.
As stated herein, TNG’s expert, Harold Asher (“Asher”), disagreed with the calculations presented by Woosley. Specifically, Asher disagreed with the factors and variables used in the method of calculations.
It is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages.[21] Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review.[22] The reviewing court must give great weight to *1031 factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.[23] The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.[24]
liinThe jury awarded LSE $194,000 in “loss of past profits.” It is not clear whether this award was only for loss of sales or a combination of loss of sales and loss of advertising revenue. Nevertheless, we find no reason to disturb that award.
We note that, at a pre-trial Daubert[25] hearing, the trial judge considered the expert qualifications of Woosley before allowing his testimony. In ruling that Woosley was qualified as an expert, the trial court noted that the factors and variables used in the method of calculation are questions of fact and, thus, their determination are within the province of the jury and go to the weight and credibility of the expert’s opinion.
Both experts gave an opinion of what the loss of sales and loss of advertising revenue should be according to their calculations. Both experts offered charts and exhibits regarding how the calculations were made and what factors and variables were considered. It is within the purview of the jury to determine credibility and assign weight to expert testimony.
Considering the expert testimony offered by both parties and the relevant law, we find no reason to disturb the jury’s award of damages. Accordingly, the trial court properly denied the JNOV on the issue of damages.
In the third assignment of error, TNG argues that, even in the event that LSE proved a breach of the Settlement Agreement, the jury should have been instructed on “plaintiff fault” as it affects damages. TNG requested that the jury be charged with the law set forth in La. C.C. art. 2008 which reads as follows:
An obligee may not recover damages when his own bad faith has caused the obligor’s failure to perform or when, at the time of the contract, he has concealed from the obligor facts that he knew or should have known would cause a failure.
If the obligee’s negligence contributes to the obligor’s failure to perform, the damages are reduced in proportion to that negligence.
[¡pin conjunction, TNG also requested a jury interrogatory as follows: “Do you find that plaintiffs [sic] shared fault in the breach of the Settlement Agreement?” If answered yes, TNG proposed a second jury interrogatory asking the jury to apportion the degree of fault attributable to the plaintiffs and the defendant. After some discussion, the trial court denied both requests.
TNG asserts that denial is reversible error. TNG argues that LSE concealed the fact that it was using an independent distributor to place its magazines in hundreds of “C” stores where the magazine was most likely to sell. TNG reasons that the elimination of TNG’s possibility *1032 of distribution in those stores made it mathematically impossible to spread the distribution as the parties intended in the Settlement Agreement.
Additionally, TNG argues that the jury had a basis to find comparative fault under the second paragraph of Article 2003 by (a) failure to initially request the list of retailers; (b) failure to inform TNG that TSE was also employing Richard Carter as a distributor, thereby causing an overlap in deliveries; and (c) failure to make reasonable efforts, consistent with industry standards and the Settlement Agreement, to obtain placement on the approved list of “A” stores.
In a jury trial, the court’s duty is to instruct jurors on the law applicable to the cause submitted to them.[26] The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate.[27] The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury.[28] Adequate jury Isainstructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues.[29]
On review, this Court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions.
Trial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge.[30]
In the matter before us, there was a discussion among the trial court and counsel for both parties regarding the jury charge and the interrogatories. This discussion took place after both parties rested and just before the closing arguments. The trial court refused to include the special charge and the interrogatories requested by TNG. The trial court decided that any allegation that LSE was liable either for bad faith concealment or negligence was not relevant to the issues in the case. The trial court reasoned that bad faith by either party was irrelevant to the facts of this case. Further, the trial court noted that the Settlement Agreement distribution clause was not an exclusive distribution contract restricting LSE from using other distributors.
A reading of the charges shows that the trial court thoroughly and correctly instructed jurors on appropriate law in this case. We do not find error in the refusal to give the specific charge of which TNG complains in this assignment of error.
The fourth assignment of error relates to the award of interest. The judgment *1033 awards legal interest on the amount of damages for lost profits ($194,000) from the date of judicial demand (March 16, 2006). The judgment also | ¡^awarded legal interest calculated on the amount of $7,636.23 from August 7, 2004 until paid by TNG. This amount represented money due LSE for late payments pursuant to invoices sent by LSE to TNG.
Civil Code Article 2000 provides:
When the object of the performance is a sum of money, damages for delay for performance are measured by the interest on that sum from the time it is due at the rate agreed upon by the parties or, in the absence of agreement, at the rate of legal interest....
The jury made a factual finding that the TNG should have made payment by August 7, 2004. The law is clear that legal interest is recoverable on debts arising ex contractu from the time they become due, unless otherwise stipulated.[31] We find no error in that determination of fact, given the evidence presented at trial. Accordingly, interest was properly awarded on the $7,636.23.
The second part of TNG’s argument on the issue of interest is that the interest on the award of $190,000 for loss of past profits should run from the date of judgment rather than the date of judicial demand. TNG’s reasoning is that it is unjust to award interest from 2006 for damages that may not have accrued until 2007-08, and asserts only that the award is a “windfall” for LSE. However, TNG provided neither law nor jurisprudence to support this position. We find no legal support for this position.
La. C.C. art. 1994 provides that an “obli-gor is liable for damages caused by his failure to perform a conventional obligation.” A failure to perform can result from non-performance or defective performance,[32] as is the circumstance in the matter before us. The jury found that TNG’s performance under the Settlement Agreement was defective, causing a loss of past profits to LSE. That finding subjected TNG to liability for damages under La. C.C. art. 1994.
134We find that the filing of the lawsuit put TNG on notice that its performance under the contract was defective, thus giving TNG an opportunity to meet the demand with an offer to perform the contract as agreed. Accordingly, we find no injustice in the trial court’s decision to award interest on the loss of past profits to run from date of judicial demand.
In its final assignment of error, TNG also asserts it is entitled to contractual attorneys’ fees for portions of its successful defense.
Both parties sought attorneys’ fees pursuant to Clause 5.3 of the Settlement Agreement, which reads as follows:
In the event that any Party or Parties commence an action or other proceeding, or assert a claim in any action or other proceeding, against another Party or Parties to.enforce this Agreement, or any portion thereof, the prevailing Party or Parties shall be entitled to recover reasonable attorney’s fees and all other costs incurred by the prevailing Party in connection with that action, proceeding or claim. For purposes of this paragraph, a “prevailing Party” is a Party who successfully enforces a material *1034 provision of this Agreement, regardless of that Party” regardless of that Party’s success or failure on any other issue, or a Party who successfully defends against an attempt to enforce a material provision of this Agreement, regardless of that Party’s success or failure on any other issue.
After a hearing on the issue, the trial court awarded LSE attorneys’ fees in the amount of 40 percent of the principal and interest accrued under the judgment rendered on the jury’s verdict. TNG was awarded certain costs, but not attorneys’ fees.
TNG argues that it had an hourly fee arrangement with its counsel, and incurred legal costs since 2005, and claims that it is entitled to attorney fees for the portions of the defense that were successful. The record shows that the defense was successful in having dismissed claims made by LSE which were outside of the contract provisions; that is, claims for personal injuries and losses, and unfair trade practice claims. TNG did not successfully defend against any material provision of |SBthe contract, and thus, has not shown that it is entitled to attorney fees under Section 5.3. This assignment of error has no merit.

LSE’S APPEAL

LSE also filed an appeal in which it argues two issues. The first issue relates to the award of attorneys’ fees. LSE points out that a small, local company was forced to confront a large wholesaler with much greater resources. LSE asserts that it took skill, determination, and hard work to ultimately prevail and to prevent this small company from going bankrupt.
The final judgment awards LSE forty percent of the principal and interest accrued under the judgment rendered on the jury’s verdict. LSE argues the trial court erred in relying on a contingency fee contract between LSE and its attorneys because TNG was not a party to that contract and because the Settlement Agreement at issue in the litigation provided for reasonable attorney fees. Therefore, LSE concludes the trial' court should have awarded a reasonable fee by the intended hourly rate consistent with the factors set forth by the Louisiana Supreme Court.
Factors to be taken into consideration in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court’s own knowledge.[33]
We agree.
In Louisiana, attorneys’ fees are only awarded where authorized by contract or statute.[34] An award of attorneys’ fees will not be modified on appeal absent a | ^showing of an abuse of the trial court’s discretion.[35] In this matter, we find the trial court abused its discretion by awarding attorneys’ fees based on a contingency fee contract between LSE and its attorneys rather than the “reasonable attorneys’ fees” set forth in the Settlement Agreement. Further, we note the large *1035 disparity between attorney fees collected by TNG’s attorneys and the amount awarded LSE’s attorneys. We have found it is not per se unreasonable to award reasonable attorneys’ fees in an amount that exceeds the amount recovered on the main demand.[36]
Accordingly, we vacate the award of 40 percent of the principal and interest accrued under the jury verdict and remand the matter for the trial judge’s consideration of reasonable fees under the factors set forth above in State, Dept of Transp. and Dev. v. Williamson,[37] which were derived from Rule 1.5(a) of the Rules of Professional Conduct.
In its second assignment of error, LSE urges that the trial court erred in assessing the costs of the expert fee and deposition of Dr. Daniel Dial, Brecheen’s personal physician, against him. TNG had filed an Exception of No Right/No cause of Action as to Brecheeris personal injury claim, but it later waived that exception. Prior to trial, the court dismissed Bre-cheen’s personal injury claim as stating no cause of action and allowed the deposition to be proffered. At a subsequent hearing to tax costs and attorney fees, the court taxed LSE $4,590 for the expenses of Dr. Dial’s deposition and expert fee. LSE urges that the expenses were not authorized by statute.
[^Generally, only depositions used at trial and introduced and accepted into evidence, are taxable as costs. If a deposition is not used at trial, the cost of the deposition, including deponent’s fee for giving the deposition, may not be taxed as costs. La. R.S. 13:4533.[38] That statute states that the costs of the clerk, sheriff, witness’ fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs.
Under the well-settled rule prevailing in our jurisprudence, the only costs which can be taxed against a litigant are those specifically provided for by statute. Therefore a decree ordering a litigant to pay all costs means that he is to pay costs provided for by statute, sometimes termed ‘legal costs’.
We know of no statute, and none has been called to our attention, which provides that the fee of an expert who is employed and paid, by a litigant for work preparatory to trial, but who is not called to testify in the case, may be considered costs and taxed as such.[39]
Under the circumstances presented here, we find the trial court erred in assessing the costs associated with Dr. Dial against LSE. We reverse that portion of the judgment of March 3, 2011.
For reasons set forth herein, we reverse that portion of the March 3, 2011 judgment that awarded LSE court costs in the amount of $4,590. We further vacate the award of attorneys’ fees to LSE. In all other respects the judgment is affirmed. *1036 Further, the judgment of June 4, 2010 is |SRaffirmed. This matter is remanded to the trial court for the re-consideration of reasonable attorneys’ fees in accordance with this opinion.

JUDGMENT OF MARCH 3, 2011 REVERSED IN PART, VACATED IN PART, AND AFFIRMED IN PART; JUDGMENT OF JUNE 4, 2012 IS AFFIRMED; MATTER REMANDED

. Louisiana Football Magazine and Louisiana Sports Magazine are used interchangeably in the testimony. However, it appears to be the same magazine.

. The original petition was filed in the Nineteenth Judicial District on March 18, 2005. However, after TNG successfully argued an exception of improper venue, the matter was transferred to the Twenty-Ninth Judicial District in May 2006.

. The deposition, although read into the record, was not filed into evidence.

. All individual claims brought by Brecheen were dismissed in a pre-trial grant of an exception of no cause of action.

. La. C.C.P. art. 1811(F).

. In Re Gramercy Plant Explosion at Kaiser, 04-1151, p. 17 (La.App. 5 Cir. 3/28/06), 927 So.2d 492, 502, writ denied, 06-1003 (La.6/14/06), 929 So.2d 1271 (citing Smith v. State, Dep’t of Transp. & Dev., 04-1317, 04-1594 (La.3/11/05), 899 So.2d 516).

. In Re Gramercy Plant Explosion at Kaiser, supra (citing Trunk v. Med. Center of La. at New Orleans, 04-0181, p. 4 (La.10/19/04), 885 So.2d 534, 537).

. La. C.C. art. 1983.

. Id.

. Davis v. Russell, 44,909 (La.App. 2 Cir.12/9/09), 26 So.3d 950, 952-53 (citations omitted).

. La. C.C. art. 1994.

. La. C.C. art. 1995.

. La. C.C. art. 1996.

. La Louisiane Bakery Co., Ltd. v. Lafayette Ins. Co., 09-825 (La.App. 5 Cir. 2/8/11), 61 So.3d 17, 34, writ denied sub nom. La Louisiane Bakery Co., Ltd. v. Lafayette Ins. Co., 11-0493 (La.4/25/11), 62 So.3d 95 (citing Cox Communications v. Tommy Bowman Roofing, LLC, 04-1666, p. 8 (La.App. 4 Cir. 3/15/06), 929 So.2d 161, 166-67); see also, Lavigne v. J. Hofert Co., 431 So.2d 74, 74 (La.App. 1 Cir.1983).

. Id.

. Pelts & Skins Exp. Ltd. v. State ex rel., Dep't of Wildlife & Fisheries, 97-2300 (La.App. 1 Cir. 4/1/99), 735 So.2d 116, 126, writ denied, 99-2036 (La.10/29/99), 748 So.2d 1167 and writ denied, 99-2042 (La.10/29/99), 748 So.2d 1168.

. Raphael v. Raphael, 05-1403 (La.App. 3 Cir. 5/3/06), 929 So.2d 825, 828; Pelts & Skins Exp., Ltd., supra.

. Id.

. Pelts & Skins Exp., Ltd., supra (citing Black’s Law Dictionary 440 (Abridged 6th Ed.1991) and Rosbottom v. Office Lounge, Inc., 94-894 at 3 (La.App., 3 Cir.4/5/1995), 654 So.2d 377, 379).

. Raphael, supra (citing J.B. Talley & Co., Inc. v. Vilaret Const. Services, Inc., 98-395, p. 11 (La.App. 3 Cir. 10/7/98), 722 So.2d 9, 14, writ denied, 99-374 (La.3/26/99), 739 So.2d 798).

. La. C.C. art. 2324.1.

. Savage v. State Farm Mut. Ins. Co., 09-852 (La.App. 5 Cir. 2/9/10), 33 So.3d 919, 922, citing Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606, reh’g denied, 4/27/01.

. Id.

. Id.

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. La. C.C.P. art. 1792(B).

. Adams v. Rhodia, Inc., 07-2110 (La.5/21/08), 983 So.2d 798, 804.

. Id.

. Doyle v. Picadilly Cafeterias, 576 So.2d 1143, 1152 (La.App. 3 Cir.1991).

. Adams v. Rhodia, Inc., 983 So.2d at 804.

. S. Marine Sales, Inc. v. Matherne, 05-181 (La.App. 5 Cir. 11/29/05), 915 So.2d 1042, 1048, writ denied, 06-0177 (La.4/24/06), 926 So.2d 545.

. La. C.C. art. 1994.

. State, Dep't of Transp. and Dev. v. Williamson, 597 So.2d 439, 441-42 (La.1992).

. Rivet v. State, Dept. of Transp. and Dev., 96-0145 (La.9/5/96), 680 So.2d 1154, 1160.

. Master Credit Corp. v. Campbell Assoc., Inc., 98-0349 (La.App. 4 Cir. 11/25/98), 724 So.2d 266, 267.

. See, Brandner v. Staf-Rath, L.L.C., 12-62 (La.App. 5 Cir. 5/31/12), 102 So.3d 186 (and cases cited therein).

. 597 So.2d 439, 441-42 (La.1992).

. Yates v. Elmer, 06-267 (La.App. 5 Cir. 11/28/06), 948 So.2d 1092, 1106, writ denied, 06-3031 (La.2/16/07), 949 So.2d 415 and writ denied, 06-3033 (La.2/16/07), 949 So.2d 417 (citing Barrilleaux v. Franklin Foundation Hosp., 96-0343 (La.App. 1 Cir. 11/8/96), 683 So.2d 348, 361, writ denied, 96-2885 (La.1/24/97), 686 So.2d 864); Lacy v. ABC Ins. Co., 97-1182 (La.App. 4 Cir. 4/1/98), 712 So.2d 189, 197.

.State Through Dep’t of Highways v. Salemi, 249 La. 1078, 193 So.2d 252, 253-54 (1966) (citing State Through Dep’t of Highways v. Salemi, 249 La. 1078, 1082, 193 So.2d 252, 253 (1966)).