**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 12, 2012

No. 11-30436

Lyle W. Cayce
Clerk

GREENWOOD 950, L.L.C.,

Plaintiff-Appellant

v.

CHESAPEAKE LOUISIANA, L.P.,

Defendant-Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before HIGGINBOTHAM, GARZA, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Greenwood 950, L.L.C. ("Greenwood"), seeks consequential damages from Chesapeake Louisiana, L.P. ("Chesapeake"), under a mineral lease. Sitting in diversity and applying Louisiana law, the district court granted summary judgment for Chesapeake, finding that the lease did not give Greenwood the right to recover consequential damages. We find that the relevant provision of the lease is ambiguous, so we vacate the summary judgment ruling and remand for further proceedings.

**I.**

On January 31, 2008, Greenwood and Chesapeake executed a mineral lease. The lease abutted land that Greenwood was developing into a subdivision.

On February 25, 2010, Greenwood filed a petition for damages in Louisiana state court, alleging that Chesapeake had damaged Greenwood's property, thereby preventing Greenwood from using it as planned. Specifically, Greenwood alleged that Chesapeake had "greatly impacted the property to the extent of preventing further efforts for a subdivision, including taking control of the main road, placing their drill sites directly on the road, preventing the subdivision as designed, and preventing further sales of the property." Greenwood further claimed that Chesapeake had agreed to pay for "all damages caused by its operations," which it contended should include the damages arising from its alleged inability to "properly use, market, or manage its property."

Chesapeake removed the action to the Western District of Louisiana. It moved for summary judgment, arguing that the lease limits its liability to liquidated damages plus actual damages to the surface of the tract it leased, the latter to be capped at the fair market value of that tract when the lease was executed. Chesapeake argued that its liability under the lease does not include consequential damages for loss of value to surrounding lots. The district court granted Chesapeake's motion, concluding that

> Upon examination of [the] phrase at issue, the paragraph in which it is contained, and the contract as a whole, the Court finds that the contested language does not contemplate damages for Greenwood's inability to develop the subdivision outside of the areas designated for surface operations. Further, no ambiguity exists that would necessitate the consideration of extrinsic evidence outside the four corners of the contract.[1]

Greenwood timely appealed.

---

[1] Greenwood 950, L.L.C. v. Chesapeake Louisiana, L.P., No. 5:10-CV-419, 2011 WL 1627992, at *3 (W.D. La. Apr. 28, 2011).

No. 11-30436

## II.

We review de novo the district court's grant of summary judgment.[2] Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[3] As part of that analysis, we review de novo the district court's interpretation of the contract, including the question of whether the contract is ambiguous.[4]

## III.

### A.  *Louisiana Contract Law*

Under Louisiana law,[5] a mineral lease is a contract by which a lessee is granted the right to explore for and produce minerals.[6]  A mineral lease is most commonly interpreted using the general rules of contract interpretation in the Louisiana Civil Code.[7]

The Code defines the judiciary's responsibility in interpreting contracts as "the determination of the common intent of the parties."[8]  Courts may not look outside the contract's four corners "in search of the parties' intent" when "the words of a contract are clear and explicit and lead to no absurd consequences."[9]

---

[2] *Am. Electric Power Co. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 285 (5th Cir. 2009).

[3] FED. R. CIV. P. 56(a).

[4] *Am. Electric Power*, 556 F.3d at 285.

[5] This case was removed to the Western District of Louisiana pursuant to federal diversity jurisdiction.  *See* 28 U.S.C. § 1332.  We apply the substantive law of Louisiana, the forum state.  *See Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)).

[6] LA. REV. STAT. ANN. § 31:114.

[7] *See Cascio v. Twin Cities Dev., LLC*, 48 So. 3d 341, 342-43 (La. Ct. App. 2010).

[8] LA. CIV. CODE ANN. art. 2045; *see Corbello v. Iowa Prod.*, 850 So. 2d 686, 693 (La. 2003).

[9] LA. CIV. CODE ANN. art. 2046; *see Corbello*, 850 So. 2d at 693.

When a contract can be construed within its four corners, interpretation of the contract presents a question of law that can be decided on summary judgment.[10]

But a contract is ambiguous when, *inter alia*, its "written terms are susceptible to more than one interpretation," when "there is uncertainty as to its provisions," or when "the parties' intent cannot be ascertained from the language used."[11] Extrinsic evidence is admissible to interpret the intent behind an ambiguous provision.[12] A doubtful provision must be interpreted "in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties."[13] If the contract remains ambiguous, and if there are two or more reasonable interpretations, the contract is construed against its drafter.[14]

---

[10] *See Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007); *see also id.* ("The determination of whether a contract is clear or ambiguous is a question of law.").

[11] *Sequoia Venture No. 2, Ltd. v. Cassidy*, 968 So. 2d 806, 809 (La. Ct. App. 2007); *accord Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002). The Fifth Circuit, describing Louisiana law, has suggested that multiple interpretations must each be "reasonable" to establish ambiguity. *See, e.g.*, *Am. Electric Power Co.*, 556 F.3d at 286; *Lifemark Hosps., Inc. v. Liljeberg Enters., Inc.* (*In re Liljeberg Enters., Inc.*), 304 F.3d 410, 439-40 (5th Cir. 2002). If there is any daylight between that suggestion and Louisiana's case law, the distinction is of no moment in this case. In any event, we must look first and foremost "to the final decisions of Louisiana's highest court" rather than this Court's prior applications of Louisiana law. *Holt*, 627 F.3d at 191.

[12] *See Am. Electric Power Co.*, 556 F.3d at 286; *McDuffie v. Riverwood Int'l Corp.*, 660 So. 2d 158, 160 (La. Ct. App. 1995).

[13] LA. CIV. CODE ANN. art. 2053; *McDuffie*, 660 So. 2d at 161. According to the Civil Code, *equity* "is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another," and *usage* is "a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation." LA. CIV. CODE ANN. art. 2055.

[14] LA. CIV. CODE ANN. art. 2056; *Sims*, 956 So. 2d at 590 (stating that the strict construction principle of LA. CIV. CODE ANN. art. 2056 applies "only if the ambiguous [contract] provision is susceptible to two or more reasonable interpretations"). Article 2056 is captioned "Standard-form contracts," but neither the Fifth Circuit nor the Supreme Court of Louisiana has confined it to standard-form or adhesionary contracts. *See In re Liljeberg Enters., Inc.*, 304 F.3d at 440 & n.74 (citing *Huggs, Inc. v. LPC Energy, Inc.*, 889 F.2d 649, 653 (5th Cir. 1989) (applying Article 2056 in a case involving a mineral lease)).

No. 11-30436

Finally, nontechnical words in a contract must be given their generally prevailing meaning,[15] and each contract provision must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.[16]

## B. *The Language of the Lease*

This case turns on the interpretation of paragraph 1 of Exhibit C of the mineral lease. In that paragraph, Chesapeake agreed

> to repair all surface damages done by its operations or shall pay [Greenwood] for all damages caused by any operations hereunder to any property, both real and personal, of [Greenwood] and [Greenwood]'s tenant, if any, including but not limited to, water wells, growing crops (including grass), trees, all animals and livestock, fences, gates, locks, cattle guards, roads, terraces, culverts, bridges, potable water, tanks, reservoirs, drainage, dwellings, buildings, barns and all other structures and improvements on the leased premises.

Greenwood, in turn, specifically agreed

> that the obligations and liabilities of [Chesapeake] for reclamation, restoration, repair or maintenance of the surface or subsurface of the leased premises shall never exceed fair market value (determined as of the effective date hereof) of the lands covered by this lease, or the portion thereof, for which such reclamation, restoration, repair or maintenance is required.

## C. *Analysis*

In the first sentence of paragraph 1, Chesapeake agreed to "*repair all surface damages* done by its operations or . . . *pay [Greenwood] for all damages* caused by any operations hereunder to any property, both real and personal, of [Greenwood] and [Greenwood]'s tenant, if any, including but not limited to,

---

[15] LA. CIV. CODE ANN. art. 2047.

[16] *Id.* art. 2050.

water wells, [etc.]"[17]  Under the district court's reading, the "repair all surface damages" language at the beginning of the sentence limits the scope of Chesapeake's obligation to "pay . . . all damages," which comes later in the sentence, to actual surface damages.  The court supported that conclusion by adverting to the sentence's list of examples of protected features (e.g., water wells, dwellings, fences, trees), which includes only surface features.  The district court further supported its interpretation by pointing to the damages cap on surface repairs, set at the fair market value on the lease's effective date.  The court reasoned that because the effective date of the lease preceded any further development of the subdivision, the lease does not contemplate as damages "the potential value of any undeveloped expansion of the subdivision."[18]  To the district court, "[t]he contract is not ambiguous, and therefore, no examination of extrinsic evidence is allowed."[19]

The district court's interpretation is reasonable, but Greenwood offers a credible alternative.  Under the first sentence of paragraph 1, Chesapeake has a disjunctive obligation to "repair all surface damages" or to "pay . . . all damages caused by any operations hereunder to any property."  Giving the words their natural meanings, "pay . . . *all* damages caused by *any* operations hereunder to *any* property" is expansive.[20]  Indeed, attributing meaning to language variation supports an inference that the "pay . . . all damages" clause is not limited to surface damages.  That is, we can infer some significance from the variation in

---

[17] When there is emphasis in a quotation from the lease in this opinion, it has been added.

[18] *Greenwood*, 2011 WL 1627992, at *3.

[19] *Id.*

[20] The "all damages" clause *is* limited to damages to *property*, both real and personal. Chesapeake does not argue that the consequential damages Greenwood seeks—namely, "preventing the subdivision as designed, . . . preventing further sales of the property, [and Greenwood's inability to] properly use, market, or manage its property"—are not damages to property.

wording between "all surface damages" and "all damages" in the provision. There is another wording variation between "all surface damages *done by its operations*" and "all damages *caused by any operations hereunder*," with the latter clause encompassing a broader range of causation and operations. Furthermore, separate provisions of the lease demonstrate that Chesapeake knew how to draft damages provisions limited to actual damages when it intended to.[21]

Greenwood counters the district court's reliance on the enumerated list of potential surface damages by pointing to the preceding "including but not limited to" language. Also, it is not obvious that the liability cap for "reclamation, restoration, repair or maintenance of the surface or subsurface of the leased premises" should apply to consequential damages arising from Chesapeake's alleged property damage. Such damages would not necessarily fall under the categories of "reclamation, restoration, repair or maintenance." Indeed, Greenwood's interpretation of the lease distinguishes "*repair* all surface damages" from "*pay* . . . all damages" in a way that distinguishes consequential damages under the latter clause from the type of damages subject to the liability cap.

Faced with Greenwood's internally consistent and reasonable alternative reading of the relevant contract language, we are persuaded that the lease is ambiguous with respect to consequential damages. Accordingly, we vacate the district court's summary judgment ruling and remand so that the district court may consider extrinsic evidence and, if necessary, construe the provision against its drafter.

---

[21] The mineral lease includes the following provisions: "Lessee shall pay for *actual damages* caused by its operations to growing crops and timber on said land leased herein"; and "In addition, LESSEE shall pay *actual damages*."

No. 11-30436

## IV.

The district court's grant of summary judgment is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.